UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Patricia A. Nicolari,<br>    *Plaintiff*,<br><br>    v.<br><br>Harbour Landing Condominium Association, Inc., *et al.*,<br>    *Defendants*. | Civil No. 3:09cv1553 (JBA)<br><br><br><br>July 23, 2012 |

RULING ON MOTION FOR SUMMARY JUDGMENT

On September 29, 2009, Plaintiff Patricia Nicolari filed a Complaint against Defendants Harbour Landing Condominium Association, Inc. ("Harbour Landing") and David Potter, Vincent DiLauro, Phyllis Sochrin, Cynthia Flaherty, Mark Libero, and Jean Lavin–Caplan individually and in their official capacities as members of the Board of Directors of Harbour Landing (collectively "Individual Defendants"). Ms. Nicolari alleged in her Complaint that by discriminating against her with respect to her ownership and attempted renovation of a condominium unit at Harbour Landing on the basis of her gender, marital status, and sexual orientation, Defendants violated the Federal and Connecticut Fair Housing Acts, committed negligent infliction of emotional distress, intentional infliction of emotional distress, breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing, and violated Conn. Gen. Stat. §§ 33-1104 and 33-1111. On December 30, 2009, Defendants moved [Doc. # 17] to dismiss, arguing that marital status and sexual orientation are not protected classes under the Federal Fair Housing Act, that Plaintiff is not permitted to bring a claim under the Connecticut Fair Housing Act after bringing an administrative claim with the CHRO, that she failed to allege legally viable claims for negligent infliction of emotional distress, intentional infliction of

emotional distress, breach of fiduciary duty, breach of contract, or breach of the implied covenant of good faith and fair dealing, and that there is no private right of action under Conn. Gen. Stat. §§ 33-1104 and 33-1111. Judge Droney denied [Doc. # 40] the motion to dismiss on October 12, 2010, and on December 22, 2011 this case was transferred to this judge. Defendants now move [Doc. # 57] for summary judgment in their favor on all of Plaintiff's claims. For the reasons that follow, Defendants' motion will be granted as to Plaintiff's Federal and Connecticut Fair Housing Act claims and the Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state–law claims.

I.      Relevant Undisputed Facts

     A.      Unit #56 and Remediation Process

Harbour Landing operates a 103–unit residential condominium complex in New Haven, Connecticut ("Harbour Landing Complex" or "Complex"). David Potter is the President of the Harbour Landing Board of Directors and an owner of a condo unit at the Complex. Vincent DiLauro, Cynthia Flaherty, Jean Lavin Caplan, Phyllis Sochrin, and Mark Libero are either current or former members of the Harbour Landing Board of Directors and condo unit owners at the Complex.

Ms. Nicolari purchased unit #12 at the Harbour Landing Complex in 1994. (Nicolari Dep., Ex. E to Defs.' Loc. R. 56(a)1 Stmt [Doc. # 58] at 39:6–12.) During the time that she owned unit #12, Ms. Nicolari requested permission to install hardwood floors and to relocate a hot water tank, and the Board granted those requests. (*Id.* at 57:14–58:4.) She also requested permission to install additional windows facing the ocean, but the Board denied that request because "they felt that it would be an invasion of privacy for other unit owners,"

although it gave her permission to install windows facing the "back area." (*Id.* at 58:19–59:17.)

At the end of September, 2006, Ms. Nicolari purchased unit #56 at the Complex from its owner, Cornelia Leavitt Scudder. (*Id.* at 88:16–25, 114:10–15; Unit #56 Purchase Agreement, Ex. F to Defs.' 56(a)1 Stmt.) Unit #56 shares a common wall with unit #54, Mr. Potter's unit. (Potter Aff., Ex. A to Defs.' 56(a)1 Stmt ¶ 17.) Prior to purchasing unit #56, Ms. Nicolari was aware of odors in the unit, which she described in her deposition as "urine smell" and "fecal matter on the floor" due to the three cats owned by the unit's prior residents. (Nicolari Dep. at 74:8–21.) Ms. Nicolari further testified that the unit "did not smell clean" and that there was a "water leak in the front skylight" prior to her purchase. (*Id.* at 75:3–20.) Mr. Potter states in his affidavit that Ms. Leavitt Scudder's son, Sloan Williams, and his partner, Evan Tinder, lived in unit #56 at the time of the sale, and that in early 2006, Mr. Potter "detected a strong odor of cat urine in their unit, which smell also invaded my unit." (Potter Aff. ¶ 18.) Mr. Potter further avers that he told Mr. Williams and Mr. Tinder that under Harbour Landing rules, they could not keep three cats in the unit, but that they refused to remove the cats and the odor became so offensive that Mr. Potter and his wife often had to leave their unit "to escape the smell." (*Id.* ¶¶ 19–21.) Ms. Leavitt Scudder's lender foreclosed on unit #56, and according to Mr. Potter, the Board decided to prepare a "Special Notice to Buyer" that would require "any prospective buyer of unit #56 to assume the obligation of remediating the contamination in unit #56, including the mold and cat urine contamination, before any renovations would be authorized by the Board." (*Id.* ¶ 23.)

Ms. Nicolari testified at her deposition that she was "fine" with having to "do a lot of work" on unit #56 to remediate the cat urine smell. (Nicolari Dep. at 96:6–25.) Prior to

3

her purchase of unit #56, Ms. Nicolari received from Mr. Potter a "Notice" of the actions that the Board would require her to take in order to remediate the contamination issues in the unit, including elimination of the contamination, inspection "by City health inspectors and/or a certified environmental specialist," and that "[t]he Board will not approve of any repairs or upgrades to unit #56 until it has been inspected by an environmental specialist and members of the Harbour Landing Board of Directors or their designees to certify that all contaminated materials and structures have been remediated or removed. The owner of #56 will be responsible for any costs of remediation necessary in unit #54, unit #48, and the common hallway." (Notice, Ex. 1 to Nicolari Aff., Ex. A to Pl.'s Loc. R. 56(a)2 Stmt; *see also* Nicolari Dep. at 111:10–22; Nicolari Aff. ¶¶ 5–6.)

A revised "Special Notice," which had been altered to remove the reference to city health inspectors among other changes, was attached the Resale Certificate produced at the closing for unit #56 (Nicolari Aff. ¶ 8); Defendants agree that the Notice provided to her in the summer of 2006 preceded those changes (*see* Defs.' 56(a)1 Stmt ¶ 38). The Special Notice contained a similar inspection requirement to the inspection requirement in the original Notice:

> The Board of Directors will require inspection of units #48, #54, #56, and the back hallway by a certified environmental specialist. The Board will not permit any repairs or upgrades to unit #56 until the three units and the hallway have been inspected both by an environmental specialist and members of the Harbour Landing Board of Directors or their designees to certify that all the corrective[] actions described above have been completed and that all contaminated materials and structures have been removed. All costs of inspection will be paid for by the owner of unit #56.

(Special Notice, Ex. J to Defs.' 56(a)1 Stmt.)

4

On July 20, 2006, prior to Ms. Nicolari's purchase, Edward Rodriguez, Housing Code Inspector for the City of New Haven, inspected unit #56 in response to a complaint from Mr. Potter and concluded that "the odor was from the cats in the unit. However the odor was contained within the unit and did not affect the air quality to others within the complex unless you visited the tenant. In my opinion the odor was contained to the unit." (Rodriguez Letter, Ex. 2 to Nicolari Aff.)  Ms. Nicolari states in her affidavit that upon taking title to unit #56, in an effort to remediate the odor problem, she "undertook extensive renovations to the Unit, essentially gutting the Unit down to the studs by removing all of the flooring, subflooring, drywall halfway up the wall, tile and plumbing fixtures." (Nicolari Aff. ¶ 21.)  She further states: "The Board and Mr. Potter insisted that I obtain permits for all work being done, which he has not required of other unit owners. . . . As early as October 15, 2006, the smell was much better within Unit 56 and gone by the end of 2006.  I kept the Board informed of my actions and progress in remediating the problem throughout the fall of 2006."  (*Id.*)

> In her affidavit, Ms. Nicolari continues:
>
> I did research and consulted with experts regarding testing for cat urine.  In October of 2006, Jesse Koslow from Enviroclean, Inc. came to the unit and took tape samples from both my unit and defendant Potter's adjacent unit.  Because there is no test for cat urine and no standard to compare it to, the findings were inconclusive.  Mr. Koslow recommended using a black light at night to determine if there were areas of urine stain and eliminate those areas.  He referenced a ThermoPure process that could be used but with no guarantee that it would eliminate any urine odor.  Dr. Brian Blanchette at Dakota Labs recommended that I use an odorfix solution to eliminate any odor on any remaining materials, which I did.

(*Id.* ¶ 22.)  On November 3, 2006, Ms. Nicolari submitted to the Board an Inspection Report from Gary Melenson of Paul Davis Restoration of Eastern Connecticut, which stated that

5

"[o]verall demolition throughout the condo at 56 Harbour Close has gott[e]n most of cat urine problem solved." (*Id.* ¶ 23; Ex. 4 to Nicolari Aff.)  The Inspection Report continued: "The first odor I noticed upon entry was a moisture problem, not a urine problem.  The only area of concern for urine was at bottom of staircase.  A little more demo by removing some more boards and the kickstep will be needed in that area, but I cannot see any permanent problems due to moisture."  (Ex. 4 to Nicolari Aff.)  Mr. Melenson proceeded to detail "moisture concerns" with respect to the outside walls and stated that repairs "should be done as soon as possible."  (*Id.*)  He concluded: "Though unlikely, if there is any residual urine odor after complete demo and removal of sources is complete, an ozone treatment would be all that is needed.  However, at this time I feel demo will take care of it.  Owner will clean unit using 'odorfix' chemical which is the process we would also use to remedy the situation."  (*Id.*)

On December 29, 2006, Mr. Potter sent Ms. Nicolari an email informing her that the Board had decided the previous night that she "must not do any more renovation work in unit #56 until a thorough inspection and testing of material samples has determined that unit #56 and adjoining units are no longer contaminated," that her installation of hardwood floor and plumbing changes were contrary to the requirements of the Notice and the Board's directives, that the Board would identify a company or companies to do the testing "and will determine how the inspecting and testing will be conducted," and that she must instruct her contractor to fix the ceiling in unit #48, which had apparently been damaged by the contractor's work.  (Dec. 29, 2006 Email, Ex. 5 to Nicolari Aff.)  Mr. Potter sent another email on January 4, 2007, instructing Ms. Nicolari that "[t]he ceiling in #48 must be fixed immediately."  (Jan. 4, 2007 Email, Ex. 5 to Nicolari Aff.)

6

On June 4, 2007, Mr. Potter sent an email to Ms. Nicolari, which reflected that both the Board and Ms. Nicolari had hired attorneys, and that the Board's attorney, Frank Pilicy, had sent two letters to Ms. Nicolari's attorney, Mr. Brownstein, but had not received a response to either. (June 7, 2007 Email, Ex. 6 to Nicolari Aff.) The email further instructed Ms. Nicolari to communicate with the Board only through her attorney and informed her:

> No Board member will visit your unit to meet with any firm until our attorneys reach an agreement on how the vender will be selected. The inspection firm and the protocol for inspection will be determined cooperatively, as agreed to at the December 2006 hearing. The selection procedure and the inspection protocols will be communicated through our attorneys.

(*Id.*)

Ms. Nicolari engaged Brooks Laboratories to conduct a mold inspection in unit #56 on June 12, 2007; in its report, Brooks Laboratories stated that "no odors were noticed," that "[n]o visual signs of water/mold damage were observed," that "[m]old smell was not noticeable throughout the unit except disturbed (during sampling) insulation under the floor on the right side of the fireplace," but that "[t]rapped moisture, elevated humidity levels, and a constant source of mold from outdoors have resulted in a mold infestation in the unit," and that "[a] thorough clean–up of the contaminated areas is recommended." (Brooks Report, Ex. 7 to Nicolari Aff.)

On June 30, Attorney Pilicy sent a letter to Attorney Brownstein, which stated: "It appears Ms. Nicolari has made significant progress in remediating the contamination in Unit 56. The recent work in the Unit has made a great difference in the air quality in the adjoining unit." (June 30, 2007 Letter, Ex. 8 to Nicolari Aff.) The letter thanked Attorney

7

Brownstein and Ms. Nicolari for sending two test reports and stated that Harbour Landing was "in the process of retaining an expert to evaluate the reports," but continued:

> It appears however, that the test for cat urine was limited to testing the air in the Unit. The important end goal of the testing and the test program agreed to between Harbour Landing and Ms. Nicolari was to test the sources of contamination so that both parties would be certain that all of the sources of the cat urine would be remediated prior to beginning other renovations.

(*Id.*)  On July 24, 2007, Kenneth Rubano, Assistant Director of Environmental Health & Emergency Response for the City of New Haven, inspected unit #56 and no cat urine odor or stain was detected in the unit or adjacent common areas.  (Rubano Letter, Ex. 9 to Nicolari Aff.)  Ms. Nicolari states in her affidavit that Harbour Landing's environmental consultant, Turtle Clan, sent her a letter on September 19, 2007 "confirming that the air quality in my unit was acceptable," but that despite the letter, the Board would not allow her to move forward with any renovations.  (Nicolari Aff. ¶ 36.)

On December 31, 2007, ServPro, after inspecting unit #56, performing mold remediation services, and cleaning the unit, submitted a written report certifying that remediation was complete.  (*Id.* ¶ 40; Nicolari Dep. at 145:1–20.)  Ms. Nicolari was still not permitted to move into unit #56 at that time, because her contractor, Charlie Brown, had damaged joists in the unit and the Board informed her that she must repair the joists.  (Nicolari Dep. at 146:2–13.)  Ms. Nicolari received an estimate of $350 to fix the joists from contractor Barry Steinberg, but the Board would not permit Mr. Steinberg to fix the joists because two engineers, Troy Dixon and Thomas Torrenti, disagreed with Mr. Steinberg's assessment of the damage and because Mr. Steinberg did not carry insurance.  (Nicolari Dep. at 150:3–8, 152:22–153:3; Potter Aff. ¶¶ 40–44.)

Mr. Potter states in his affidavit that the Board voted to commence litigation in Connecticut Superior Court to enjoin Ms. Nicolari from implementing "a potentially dangerous and 'cheap' fix to the damaged joists" (Potter Aff. ¶ 43), however Ms. Nicolari, in her affidavit, states that Harbour Landing brought its first lawsuit on April 18, 2008 "seeking to foreclose on my unit" for non–payment of fines, including those assessed for not repairing the joists (Nicolari Aff. ¶¶ 47–48). The joists were ultimately repaired by the contractor Baybrook, for $10,000, paid by Ms. Nicolari's homeowner's insurance. (Nicolari Dep. at 152:9–15.)

On March 8, 2008, the Board issued a decision, declaring that the Board would solicit bids and select and engineer to repair the damaged joists, the payment for which Ms. Nicolari would be responsible; that Ms. Nicolari would pay Harbour Landing fines of $25 per day from the date she purchased unit #56 through December 24, 2007, a total of 452 days, for failure to remediate the odor; that Ms. Nicolari would pay for an air purification system to remediate unit #54; that Ms. Nicolari would pay a $50 fine for each unauthorized renovation to unit # 56; that Ms. Nicolari would pay all of Harbour Landing's legal fees associated with actions it took in response to Ms. Nicolari's actions; that Ms. Nicolari would pay all costs of inspection and cleanup of units #56, #54, and #48; and that the Board would not approve any renovations to unit #56 until the joists have been repaired and Turtle Clan confirms that decontamination of unit #56 is complete. (Mar. 8, 2008 Decision, Ex. N to Defs.' 56(a)1 Stmt.) The total fines imposed by the Board came to $68,760. (*Id.*)

Harbour Landing sued Ms. Nicolari in Connecticut Superior Court, Judicial District of New Haven, seeking to collect these fines and other costs after Ms. Nicolari refused to pay. (Nicolari Aff. ¶¶ 47–48; Potter Aff. ¶ 52; Mar. 17, 2010 Mem. of Decision, CV 08-5021915S,

9

Ex. O to Defs.' 56(a)1 Stmt.) On March 17, 2010, Judge Berdon awarded $9,035 plus taxable costs to Harbour Landing for Turtle Clan's and Troy Dixon's charges. (Mar. 17, 2010 Mem. of Decision at 1–2.) Judge Berdon declined, however, to award attorney's fees, and found that Harbour Landing was not entitled to the fines it sought because it did not give Ms. Nicolari "notice and an opportunity to be heard." (*Id.* at 2.)

Ms. Nicolari claims that the individual Defendants other than Mr. Potter—Vincent DiLauro, Phyllis Sochrin, Cynthia Flaherty, Mark Libero, and Jean Lavin–Caplan—did not exercise independent authority, but instead abdicated their authority to Mr. Potter and "rubber–stamped" everything that he wanted. (Nicolari Dep. at 207:23–210:15; Nicolari Aff. ¶¶ 71–72.) Defendants Vincent DiLauro, Cynthia Flaherty, and Jean Lavin–Caplan state in their affidavits that Ms. Nicolari's sexual orientation or marital status never came up in any of the Board's discussions of unit #56 or Ms. Nicolari's actions. (DiLauro Aff., Ex. B to Defs.' 56(a)1 Stmt ¶ 10; Flaherty Aff., Ex. C to Defs.' 56(a)1 Stmt ¶ 13; Lavin–Caplan Aff., Ex. D to Defs.' 56(a)1 Stmt ¶ 11.) As evidence that the Board imposed the same requirements on other unit owners, Defendants point out that in May, 2006, the Board required that Michael Fattahi, a heterosexual married male who owned unit #41, remove the marble floor that he had installed in his unit in response to complaints about noise transmission from his downstairs neighbors, after he had not sought the Board's permission prior to the installation of the floor. (Ex. K to Defs.' 56(a)1 Stmt.)

Other unit owners, however, claim that the Board's requirements were not universally applied to all owners. Magreth Butterworth, who is married and heterosexual, states in her affidavit that she has "witnessed numerous instances of Patricia Nicolari being treated differently by the HLCA Board and [has] witnessed David Potter and Vincent

DiLauro harassing Ms. Nicolari." (Butterworth Aff., Ex. B to Pl.'s 56(a)2 Stmt ¶¶ 2–3.) Ms. Butterworth cites as examples of different treatment and harassment that she had a tankless water heater installed without approval from the Board, with Mr. Potter's awareness, but that Nicolari was denied approval for a similar water heater; that with respect to the urine odor, "Ms. Nicolari attempted to meet the Board's requirements but it seemed that every time she did what they asked of her, they would change the requirement to make her do something additional"; that Mr. Potter sent a letter to all unit owners in June 2008 imposing a special assessment and singling out Ms. Nicolari; and that the Board "imposed requirements on Ms. Nicolari that it did not impose on any other unit owner." (*Id.* ¶¶ 4–6, 13.)

Richard Sloan, a married heterosexual male, states in his affidavit that he had gas and water lines installed in the floor of his unit with Mr. Potter's awareness, but that he was not required to obtain Board approval or permits. (Sloan Aff., Ex. C to Pl.'s 56(a)2 Stmt ¶¶ 2–3.) Mr. Sloan also states that in a conversation with Mr. Potter about Ms. Nicolari, "Mr. Potter stated that there were 'many of those kind of women' living at Harbour Landing," and that the Board "imposed requirements on Ms. Nicolari that it did not impose on any other unit owner." (*Id.* ¶¶ 4–6.) Zoe Stetson, who is heterosexual, states in her affidavit that she renovated her kitchen in 2009 without Board approval and was told midway through the renovation that she needed a building permit from the City of New Haven, but that when she refused, "[t]he matter was dropped." (Stetson Aff., Ex. D to Pl.'s 56(a)2 Stmt ¶¶ 2–4.)

In her affidavit, Ms. Nicolari makes additional accusations against Defendants, primarily Mr. Potter, but does not provide any additional support for these allegations. She states in her affidavit that "[t]he Association, by and through its Board members, specifically, David Potter and Vincent DiLauro, have gained unnecessary access to my Unit under the

11

guise of 'inspecting' my Unit even though they were not qualified to do so but instead done to harass me." (Nicolari Aff. ¶ 61.)  She also alleges that Mr. Potter accessed unit #56 when she was not home, and without her permission, "in an effort to sabotage test results as to the remediation process."  (*Id.* ¶ 62.)  Ms. Nicolari bases this belief on the fact that she found a fresh urine stain "on the day before testing was to be done," that she found wire "wedged in a toilet drain" in the unit, and that it is her "understanding" that Mr. Potter had a key to unit #56.  (*Id.*)  Ms. Nicolari also alleges in her affidavit that Mr. Potter has yelled at her on many occasions because she "would not accede to his demands," and that he "has also repeatedly approached and questioned contractors and workers performing work at [unit #56] in an attempt to intimidate and harass the workers into not performing the work for which [she] contracted and paid them to do."  (*Id.* ¶¶ 63, 66.)

II.     Discussion[1]

    A.     Housing Act Claims

Under the Federal Fair Housing Act, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  Under the Connecticut Fair

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

Housing Act it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, creed, color, national origin, ancestry, sex, gender identity or expression, marital status, age, lawful source of income or familial status." Conn. Gen. Stat. § 46a-64c(a)(2). Connecticut law also forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of sexual orientation." *Id.* § 46a-81e(a)(2).

To succeed on her claims that she was treated disparately by Defendants on the basis of her gender, sexual orientation, and/or marital status under either the Federal or Connecticut Fair Housing Act, Ms. Nicolari has the burden of first establishing a prima facie case of discrimination. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Zlokower v. Comm'n on Human Rights & Opportunities*, 200 Conn. 261, 264–65 (1986) (federal fair housing analysis, including *McDonnell Douglas* burden shifting framework, applies to Connecticut Fair Housing Act). To meet this burden, Ms. Nicolari must present evidence that animus against a protected group was "*a* significant factor in the position taken by the . . . decision–makers themselves or by those to whom the decision–makers were knowingly responsive." *Reg'l Econ.*, 294 F.3d at 49 (emphasis in original) (internal quotation marks and citations omitted). If Ms. Nicolari can make out a prima facie case, the burden of production then shifts to Defendants "to provide a legitimate, nondiscriminatory reason for their decision." *Id.*

Defendants argue that Ms. Nicolari has failed to establish a prima facie case of discrimination. Ms. Nicolari argues that the requirements imposed on her efforts to remediate the contamination in unit #56 occurred under circumstances that give rise to an inference of discrimination. According to Ms. Nicolari, these circumstances are that "[m]arried heterosexual males and females were not subjected to the same treatment and differing standards that plaintiff was," and that Mr. Potter made a comment to Mr. Sloan in reference to Ms. Nicolari that there were "many of those kind of women" at Harbour Landing. (Obj. [Doc. # 67] at 7.)

These circumstances, which comprise the entirety of Ms. Nicolari's evidence of alleged discrimination, are insufficient to meet her burden of establishing a prima facie case. None of the married heterosexual occupants at the Harbour Landing Complex who performed renovations or added hardware to their units did so under circumstances remotely similar to those confronted by Ms. Nicolari. Ms. Nicolari purchased a unit that was contaminated with cat urine and sold with the restriction that Ms. Nicolari must remediate the contamination and may not perform any repairs or upgrades until the unit had "been inspected by an environmental specialist and members of the Harbour Landing Board of Directors or their designees" to certify that "all contaminated materials and structures have been removed." (Notice; Special Notice.) Neither Ms. Butterworth, nor Mr. Sloan, nor Ms. Stetson had units in comparable condition with comparable restrictions placed upon them at the time of sale.

It is undisputed that at the time Ms. Nicolari purchased unit #56, she was aware of the cat urine contamination and the requirement imposed by both the Notice and the Special Notice that she have an environmental specialist and the Board certify that "all contaminated

14

materials and structures have been removed" before she would be allowed to renovate the unit. It is further undisputed that at no point prior to the ServPro inspection report on December 31, 2007, did any inspector certify that all contaminated materials had been removed from unit #56. Gary Melenson's November 3, 2006 inspection report stated that "most" of the urine problem had been solved, but that "[a] little more demo" would be needed. (Ex. 4 to Nicolari Aff.) Brooks Laboratories conducted a mold inspection on June 12, 2007 and recommended a "thorough clean–up of the contaminated areas." (Ex. 7 to Nicolari Aff.) Kenneth Rubano inspected the unit on July 24, 2007 and Turtle Clan on September 19, 2007, and both confirmed the lack of urine odor, but neither made any conclusions about the presence or absence of contaminated materials or structures. The parties also do not dispute that Ms. Nicolari's contractor damaged the joists in unit #56 prior to the Board approving the commencement of renovations.

      In light of the lack of comparability between the condition of Ms. Nicolari's urine–contaminated unit and the relatively minor alterations performed by the tenants with whom she seeks to compare herself, no reasonable jury could infer discriminatory animus from the imposition of the Notice or Special Notice. Nor could a reasonable jury, in light of Ms. Nicolari's undisputed failure to abide by the terms of the Notice, infer that the Board's refusal to allow renovations to unit #56, or their imposition of fines, constituted discrimination. Neither could Mr. Potter's comment to Mr. Sloan about "many of those kind of women" give rise to a reasonable inference of discriminatory animus. Mr. Potter's comment did not describe what "kind of women" Mr. Potter was talking about, nor, particularly in light of Vincent DiLauro's, Cynthia Flaherty's, and Jean Lavin–Caplan's averments that Ms. Nicolari's sexual orientation or marital status was never discussed by the

15

Board, does it indicate that Mr. Potter made any of his decisions with respect to the Board's actions based on the "kind of woman" that Ms. Nicolari is. Thus, there is no evidence from which a reasonable jury could conclude that Ms. Nicolari's gender, sexual orientation, or her marital status were significant factors in the Board's decision–making with respect to unit #56.

Ms. Nicolari has therefore failed to establish a prima facie case of discrimination, and Defendants' motion for summary on Plaintiff's Federal and Connecticut Fair Housing Act claims, Counts One and Two of the Complaint, is granted.

B.     State–Law Claims

The remainder of Plaintiff's claims—for negligent infliction of emotional distress, intentional infliction of emotional distress, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, violations of the Connecticut Nonstock Corporations Act, Conn. Gen. Stat. §§ 33-1104 and 33-1111—arise under Connecticut state law. Defendants request that the Court decline to exercise supplemental jurisdiction over these claims.

Supplemental jurisdiction is a matter of discretion; the Court need not exercise supplemental jurisdiction in every case, and "needless decisions of state law should be avoided." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.*; *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir.2004). "[D]eclining to exercise jurisdiction after all original–jurisdiction claims have been dismissed is especially appropriate where the pendent claims present novel or unsettled questions of state law." *Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011).

16

Particularly in light of the fact that it is not clearly established under Connecticut law whether there is a private right of action under the Connecticut Nonstock Corporations Act, or whether condominium associations owe a fiduciary duty to individual unit owners, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state–law claims. These claims are therefore dismissed.

III.   Conclusion

For the reasons stated above, Defendants' motion [Doc. # 57] for summary judgment is GRANTED as to Counts One and Two of the Complaint. The Court declines to exercise supplemental jurisdiction over the remaining counts. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of July, 2012.